Bob Dale McDANIEL, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17391.

Court of Criminal Appeals of Oklahoma.

April 26, 1973.

Rehearing Denied May 15, 1973.

Carroll Samara, Lawrence H. McMillin, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Nathan J. Gigger, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Bob Dale McDaniel, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, Case No. CRF–71–293, CRF–71–294, CRF–71–295, for the crimes of Sodomy, Assault With a Dangerous Weapon, and Rape in the First Degree. He was sentenced to serve a term of ten (10) years on the Sodomy case, five (5) years on the Assault case and two hundred (200) years on the Rape case, in the state penitentiary in accordance with the verdict of the jury and a timely appeal has been perfected to this Court.

Joseph Mills and Marilyn Gould, prosecuting witnesses, lived together without formal ceremony and claimed to be husband and wife by their own private vows, each going by their own last name.

Mills testified that on February 2, 1971, at about 10:30 P.M. he picked Gould up at the Holiday Inn in downtown Oklahoma City where she worked as a waitress and that they started for Edmond where they lived but ran out of gas as they traveled on the Broadway Extension near the Britton Road Exit, at about 11:00 to 11:30 P.M. They walked down to Britton Road to a point west of the Broadway Extension when the defendant came along in a yellow Ford Torino. Defendant gave Gould and Mills a ride to a filling station on North Western Avenue where Mills bought some gas in a plastic container. According to Mills, defendant drove back toward Britton Road, took a side street, and stopped at a stop sign. Mills testified that the defendant at this time pulled a knife, held it to Mills' face and ordered him out of the car. Mills was sitting in the front seat and Gould was in the back seat. Mills opened the door of the car, fought off the defendant and tried to let Gould out of the car. Gould was trying to get out between seats, but defendant turned the corner with Mills partly out of the car; his legs dragging on the concrete for one-half to one block. Mills testified that he fell out of the car while defendant was starting and stopping and that defendant proceeded with Gould in the back seat. Mills further testified that he did not know what happened to the container of gasoline. On cross-examination Mills stated that he loosened the cap of the plastic container but that he didn't know if the cap had come off. Mills then testified that he flagged down a car going the same direction as the defendant, and that the driver took Mills back to the service station where Mills had earlier purchased the gasoline. Upon arriving at the service station, Mills called the police. The driver stayed with Mills until the police came but no one got the name of the driver, the description of his car or any other details of the driver.

Patrolman Kenneth W. Kidd testified that he was on duty the night of February 2, 1971, and that he responded to a call about 11:20 P.M. to go to a filling station on North Western. When Patrolman Kidd arrived at the station he spoke with Mills, who described the incident, but did not speak with anyone else. Patrolman Kidd testified that the only thing he observed about Mills was that Mills was excited and keyed up and that it was his (Kidd's) practice to observe persons in such situations.

Gould, who is over twenty-one years of age, testified to incidents similar to what Mills had related up to the time Mills fell out of defendant's car. Gould stated that she begged the defendant to let her go, but

that defendant drove on. She did not know exactly where defendant was driving. Somewhere along the way defendant had Gould get into the front seat. She further testified that defendant told her to shut up, but that when she didn't, defendant "reached over and knocked me in the side of the head" and that defendant threatened to hurt her, kill her and that he ordered her to take off her clothes. According to Gould, defendant stated "You better take off your clothes. Don't forget I have a gun and a knife." After a time, defendant turned off the road, stopped the car, zipped down his pants and told her to perform oral sodomy. According to Gould, she refused and defendant then took her neck in his hands and made her do it, then threw her back against the seat and raped her. After this, defendant started back toward the City and got in a drag race with a "green" car, which ran off the road. Gould revealed that defendant backed up, told her not to say anything, picked up the driver of the "green" car and took this driver to a phone booth. The driver of the "green" car was never identified, nor did Gould complain to such driver. Defendant then took Gould to the Wilshire Motel, although she did not want to go, and told Gould that she was going to stay with him and that she might get shot if she tried to get away. According to Gould, defendant stated that "the people running this motel are friends of mine and we are all in this together and they won't think anything of shooting you if you try to get away so stay in the car." Defendant pulled into the motel, got out of the car and got a room. Gould stated that she could not see defendant or the motel clerk, that she didn't look, and that she didn't know whether or not the keys were in the car, or if it was locked, and that she didn't try to get away because she was afraid. She said that had she felt it safe she would have, gotten out of the car. After a few minutes, defendant returned to the car, drove to a room about a block away from the motel office, went in this room with Gould, hit her on both sides of her face, threatened her and

left the room to get some cokes. Upon return, the defendant made Gould commit oral sodomy and raped her again. According to Gould, defendant penetrated her private parts, against her will, by force, while making threats against her life. Defendant fell asleep and Gould got dressed and went to a truck stop across the street from the motel. She did not stop at the motel office or complain to anyone at the motel or at the truck stop that she had been abducted and ravished. Gould testified that she had under a dollar in change with her, but maybe as much as ten dollars. She testified that after she arrived at the truck stop she called unnamed friends and finally reached friends who came to the truck stop. After reaching these friends, Gould testified that she then called Mills.

Police Officer Michael Ray Hoover testified that he was on duty on the morning of February 3, 1971, that he responded to a call to go to the Wilshire Motel, but upon arriving couldn't find anyone who had called. He stated that he went to the truck stop where he saw both Gould and Mills. Officer Hoover was directed back to the Wilshire Motel and to the room defendant had obtained. A yellow 1970 Torino car was located in front of this room. Hoover stated that prior to the time of his going to this room, information was received from Gould and Mills as to defendant's identification. Thereupon Hoover went to the defendant's room and adequately advised defendant of his constitutional rights and arrested defendant. Defendant was placed in Officer Hoover's police car. According to Hoover, the defendant talked freely and was extremely cooperative and not belligerent. Defendant told Hoover that he had picked up Gould at a tavern at Britton Road and that they had gone to several bars in the area before going to the motel, where defendant and Gould had checked in at 3:30 A.M. on February 3, 1971. Hoover stated that empty coke cans and glasses were in the room; that the coke machine wasn't more than a half a block from defendant's room; that they searched defendant and he had

no knife on him; and that they impounded the car of the defendant and conducted a custodial search of the car. According to Hoover, a knife was found in the front seat of the vehicle. The knife was closed. The defendant was in custody, and not in the car, at the time of the search. No warrant was obtained by the officers.

The defendant testified that he was thirty-one, married and worked for himself in the construction business. He stated that he did pick Mills and Gould up on Britton Road, as they testified, took them to get gas and then went to a tavern on Britton Road along with Gould and Mills. According to the defendant, he got out of his car and left Gould and Mills standing in back of it. Defendant went into the tavern. Fifteen minutes later, Gould came into the bar. He talked to her and they left together and went to another tavern, then to a night club, where defendant and Gould stayed until about 2:30 A.M. Defendant stated that they decided to go to the Wilshire Motel. After checking into a room, Gould went to the office to get a coke and defendant later went to get a coke. Defendant stated that he had over two hundred dollars with him when he arrived at the motel, and that the next morning, after the police woke him, he had only eight dollars. Defendant stated that he had had intercourse with Gould, with her consent and in a normal way, and didn't know when she left. He further testified that he never threatened either Gould or Mills and that Gould never attempted to run away from him that night. He identified the knife as his, but stated that he used it last to fix wiring in an apartment. He denied drag racing with a "green" car. It was brought out at trial that defendant had been in reformatory under the Youth Act for unauthorized use of a motor vehicle and that he served a six year sentence in the Arkansas State Penitentiary for Grand Larceny.

John Cherry, a witness for the defense, testified that he had worked at the truck stop across from the Wilshire Motel on the night of February 2, 1971, and until 6:00 A.M. the next morning. Cherry stated that Gould came into the truck stop just before Cherry got off work, acted normal, asked for change, and bought some cigarettes and a coke. He further testified that Gould's hair was combed, that she had on a coat and dress and that she didn't complain to him about anything. According to Cherry, Gould was in the truck stop for an hour to an hour and a half, she used the telephone and ran out of the truck stop crying when her friends arrived.

Other defense witnesses included Janice Buchanan, who testified that she had been working at the tavern on Britton Road on the night of February 2, 1971, and that Gould came in, and talked with the defendant. Buchanan admitted of being convicted of prostitution. Ivan Benear testified that he had known the defendant for a long time and that Benear had gone to the tavern on Britton Road on the night in question about 11:00 P.M. Benear stated that when he pulled up in front of the tavern, Gould and a long haired man were standing there with a jug. According to Benear, Gould asked him for a ride to a car that had run out of gas. Benear refused Gould and went into the tavern. He stated that Gould came into the tavern, and that defendant was also in the tavern. Benear was never convicted of a crime involving moral turpitude but was served a subpoena to testify while in jail.

In rebuttal, Officer Anthony Hyde testified to what the defendant told him upon interrogation on the afternoon of February 3, 1971. Hyde testified that he had advised defendant of his rights and that the defendant talked freely. In substance defendant's statements were the same as those made by defendant at the trial. Hyde revealed that the detective bureau, of which he was a member at the time, usually made follow-up investigations of preliminary reports but that he only spoke with Gould, Mills, McDaniel, a gas station attendant and a doctor who examined Gould. Hyde also stated that Gould never

mentioned to him that defendant had a gun.

■ It is first contended on appeal that the evidence was insufficient to sustain the verdicts and judgments. Defendant argues that the verdicts were contrary to law and evidence and that the sentences imposed were grossly excessive. In Butterfield v. State, Okl.Cr., 489 P.2d 1345 (1971), this Court cited with approval the case of Bryant v. State, Okl.Cr., 478 P.2d 907 (1971), in which it was stated:

"This Court has consistently held that a conviction for rape may be had on the uncorroborated testimony of the prosecutrix, or on slight corroboration, where the testimony of the prosecutrix is not inherently improbable or unworthy of credence. Haga v. State, Okl.Cr., 422 P.2d 221; Gaines v. State, Okl.Cr., 267 P.2d 612; and the many cases cited therein. However, this rule has been limited to the effect that we will carefully examine the record in cases of this character, to see that the evidence of the prosecutrix is clear and convincing, and is not inconsistent, incredible or contradictory. It is the exclusive province of the jury to weigh the evidence and determine the facts, and where the verdict is based on probable testimony, the reviewing court will not interfere with the verdict, though there is a sharp conflict in the evidence."

In the *Bryant* case it was also stated by this Court:

"A careful review of the record does reveal some inconsistencies in the testimony of the prosecutrix. These inconsistencies apply, however, to related events and not to the act of sexual intercourse."

As for the finding that the defendant committed sodomy and rape in the first degree, a careful examination of the record indicates that the evidence of the prosecutrix is clear and concise and does not suggest that it is improbable or false. The inconsistencies in her testimony do not apply to the act of sodomy or sexual intercourse, but rather to related events. As for the finding that the defendant committed an assault with a dangerous weapon, the testimony of the prosecutrix was substantiated by prosecuting witness Mills and it is not unreasonable or incredible. We are of the opinion that the evidence was sufficient to support the verdicts and judgments of the trial court.

■ The second proposition urged by the defendant is that the trial court erred in not granting defendant a mistrial which was requested after a prosecuting witness, in the presence of the jury, committed improper conduct. Defendant contends that this was prejudicial to defendant and deprived him of the right to a fair and impartial trial. Defendant cites Foster v. State, Okl.Cr., 308 P.2d 661, at page 664 and 665, wherein this Court stated:

"The defendant contends, however, that striking it from the jury's consideration would not strike it from their minds and that the injury had already been done. Such a voluntary statement in a case of this character was most prejudicial and may have been the thing that tipped the scales against the defendant. The court's admonition to the jury, though removing the evidentiary harpoon in a technical sense, was not sufficient to repair the injury and the impression left on the jury's mind. This alone may have been what caused the jury to find the defendant guilty."

The record discloses that the court admonished the jury not to consider the vile language directed to the defense counsel by a prosecuting witness. The record further discloses that the outburst occurred by reason of the conduct of the defense counsel and that even if such outburst was improper, it was not fundamental error. In *Foster,* the jury was not strongly persuaded on the defendant's guilt. They passed the question of punishment on to the trial court. In the case at bar, the jury was strongly convinced of the defendant's guilt and such outburst cannot be said to have effected the outcome of the proceedings.

We are of the opinion that this proposition is without merit.

■ It is next contended on appeal that the trial court erred in giving improper instructions. Defendant argues that the trial court had a duty to instruct on included offenses as to the charge of assault with a dangerous weapon and that a pocket knife per se is not a dangerous weapon. Under 21 O.S. § 645 assault with a dangerous weapon is defined:

"Every person who, with intent to do bodily harm and without justifiable or excusable cause, commits any assault, battery, or assault and battery upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots at another, with any kind of firearm or air gun or other means whatever, with intent to injure any person, although without the intent to kill such person or to commit any felony . . . ."

In Hay v. State, Okl.Cr., 447 P.2d 447 (1968), this Court stated:

"The manner of use of an instrument may be controlling factor in determining whether it is a 'dangerous weapon,' within statute providing punishment for assault with a dangerous weapon."

In the case at bar, the State's evidence was defendant held an opened pocket knife to the face of one Mills and ordered him out of defendant's car with threats of killing Mills if he did not get out of the car. Mills testified that he tried to knock the knife out of defendant's hand and grabbed defendant's arm to prevent himself from being cut. We cannot say that under these circumstances the knife was not a dangerous weapon. Furthermore, defendant did not make a request for particular instructions nor did he manifest his dissatisfaction with the instructions given by the trial court. In Meekins v. State, Okl.Cr., 420 P.2d 267 (1966) this Court held:

"If a defendant is not satisfied with the trial court's instructions, it is his duty to request what he considers to be the proper instructions in writing; and unless the request is made, reviewing court will not deem the failure of trial court to give an instruction reversible error, unless it is of such fundamental nature as to deny defendant a fair and impartial trial."

Moreover, he denies any assault and battery with the knife—that he made use of the knife at all on the night in question. For all of the foregoing reasons, we are of the opinion that this assignment of error is without merit.

■ The defendant's next proposition asserts that the trial court should have dismissed all but one of the charged offenses since all charges arose out of the same transaction. Defendant argues that the assault against Mills was for the purpose of effectuating the rape. The defendant cites Richmond v. State, Okl.Cr., 492 P.2d 349 (1971) wherein the court stated:

"Where the same act may constitute different offenses, the different offenses may be set forth in separate counts in the alternative and defendant convicted of either offense. 22 O.S.1961, § 404. But multiple convictions and punishments for a single criminal act is prohibited. Title 21 O.S.Supp.1970, § 11, provides in relevant part:

"[A]n act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, except that in cases specified in §§ 51 and 54, the punishments therein prescribed are substituted for those prescribed for a first offense, but in no case can he be punished under more than one * * *."

The assault with a dangerous weapon, the rape, and the sodomy were clearly separate and distinct crimes. The assault was committed on Mills and completed when Mills fell from defendant's car. The act of sodomy and rape were removed by at least four hours from such assault. Furthermore, the proof required for a conviction of rape upon the prosecutrix is quite dissimilar from the proof required for a con-

viction of assault upon a third party. The proof required for a conviction of sodomy is also dissimilar from the proof required for a conviction of rape. The fact that the sodomy occurred just prior to the rape does not negate the fact that separate crimes were committed. In Kupiec v. State, Okl.Cr., 493 P.2d 444 (1972), we cited with approval Tucker v. State, Okl.Cr., 481 P.2d 167 (1971), wherein it was stated:

"We are of the opinion that the fact the crimes were committed in rapid succession does not negate the ultimate fact that separate crimes were committed. To hold otherwise would open the door for persons to commit any number of crimes simultaneously, knowing they could only be punished for one."

For the foregoing reasons, we are of the opinion that the joinder of offenses was proper and that the trial court did not err in failure to dismiss all but one of the charged offenses.

Defendant lastly contends that the trial court erred in allowing the introduction of the pocket knife found on the front seat of defendant's car after defendant had been arrested and taken into custody. Defendant argues that the search was a "custodial search" and points out that no warrant was obtained. In Turner v. State, Okl.Cr., 504 P.2d 898 (1972), this Court stated in discussing the introduction of photographs taken from a defendant's motel room:

"This is a close question which, because of the overwhelming evidence of the defendant's guilt and the lack of prejudice shown, we do not deem necessary to discuss in this opinion."

A reasonable view of the record indicates other substantial evidence from which the jury could find the defendant guilty. It is thus apparent that the jury could not have been prejudiced by the admittance of the pocket knife.

For all of the above and foregoing reasons we are of the opinion that the judgment and sentence appealed from should be, and the same is hereby affirmed.

BUSSEY, J., concurs and BRETT, J., specially concurring.

BRETT, Judge (specially concurring).

I agree that defendant's convictions for assault with a dangerous weapon and first degree rape should be affirmed; but I believe the sodomy charge should have been merged with the rape charge. I also repeat again, that I believe the two hundred year sentence is unreasonable and should be modified to life imprisonment.