Earl Daniel COOPER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–73–271.

Court of Criminal Appeals of Oklahoma.

June 28, 1974.

As Corrected July 10, 1974.

W. G. "Gil" Steidley, Jr., McAlester, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., William Thiebaut, Jr., Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Earl Daniel Cooper, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Pittsburg County, Case No. CRF–72–112, for two counts of the crime of Murder. In accordance with the jury verdict, he was sentenced to serve two (2) life sentences, to run consecutively, in the state penitentiary, and from said judgments and sentences a timely appeal has been perfected to this Court.

Briefly stated, the facts show that at approximately 7:30 p. m. on June 16, 1972, defendant was engaged in a conversation with his estranged wife and mother-in-law, on the sidewalk beside his parent's home, where he resided in McAlester, Oklahoma. During the conversation an argument developed and defendant, using a gun he had concealed beneath his shirt, shot and killed both women—Marguerite Cooper, his wife, and Bertha Mae Anderson, his mother-in-law.

The first witness called was the defendant's 16 year old daughter, Patricia Cooper, who testified that prior to the shooting she and her mother and grandmother were on their way to church. The witness further testified that the defendant had telephoned her mother earlier in the evening of the shooting and asked if he could accompany the family to church services, and that they had walked by his house to pick him up. Defendant's daughter said that an argument ensued between defendant and his mother-in-law when he pulled a gun from beneath his shirt and asked Mrs. Anderson if she was ready to die. The witness testified to hearing shots fired and seeing her grandmother slump to the ground while her mother was "kind of half-lying, half-sitting on the ground." (Tr. 267). Patricia said she then ran away from the scene to a nearby service station where she called to the police, not returning to the shooting area until she saw the police car arriving.

Earl Daniel Cooper, Jr., the 14 year old son of the defendant, testified that he was at the Cooper grandparent's house with defendant immediately before the shooting. He testified that his father had come into the bedroom the two shared, and told him to keep on playing his guitar; then he heard his father go outside through the back door of the house. A few minutes later, Earl, Jr. heard his grandmother, Mrs. Cooper, yelling at his father, at which time he went out the front door of the house to see what the trouble was. He saw the defendant holding a gun, pointing it at his mother and grandmother. He then ran toward his father, who told him to get back. He heard shots and ran away. Turning again to look, he saw Mrs. Anderson fall to the ground and a few seconds later saw his mother lying on the ground, although he did not remember seeing her shot. The witness further testi-

fied that after the shootings his father put the gun to his own head, and began crying.

The next witness for the State, Oliver "Mule" Irvin, testified that he knew the defendant and his wife, but failed to give any pertinent information about the shooting incident. During the course of direct examination, after a lengthy memory lapse by the witness, he was declared a hostile witness and cross-examined by the State where he testified that he had never heard the defendant say he planned to kill anyone, and that he had never loaned the defendant money. (Tr. 342).

Billy Joe Coop, a training officer with the McAlester Police Department, next testified that at approximately 12:00 a. m. June 17, 1972, Oliver Irvin had come to the police station to give information regarding the Cooper incident and that Officer J. B. Orr had also heard the information given at that time.

Patrolman Simp McClendon testified that he went to the scene of the shooting, being the first police officer to respond to the call. He said that when he drove up, the defendant walked over to meet him, called him by name, and said: "I did it— take me to jail, get me out of here." (Tr. 371). He recalled that at that time he saw the bodies of two women lying in the street and that the time was approximately 8:15 p. m. Officer McClendon further testified that later that evening, at approximately 10:00 p. m., he received a call from the police dispatcher that someone was trying to get a gun off the roof of the carport at the Cooper residence. He responded to the call and found a .38 caliber revolver on the roof which belonged to the defendant and which the State introduced as Exhibit #4.

It was stipulated by the parties in the trial (Tr. 375) that Dr. M. D. Bellamy, a pathologist who performed the autopsy on Bertha Mae Anderson on June 17, 1972, would have testified that in his opinion Mrs. Anderson died of gunshot wounds— one in the chest, one in the head, and one in the abdomen. He removed two of the bullets and they were submitted to the court as State Exhibit #1.

Further stipulation showed that Dr. Charles D. Marshall, who performed an autopsy on Marguerite Cooper on June 17, 1972, would have testified that she died of gunshot wounds—one behind her left ear, and the second in the middle of the right side of her back. He removed the bullets from the body and they were submitted to the court as State's Exhibit #2.

It was further stipulated that Ray Lambert, of the State Bureau of Investigation, examined the revolver found at the Cooper residence, that four .38 caliber bullets removed from the bodies and five .38 casings were definitely from the gun. The gun and casings were marked as State's Exhibits #4 and #5, and introduced to the court.

Sgt. Alvin Weeks, a McAlester policeman, testified that at 8:15 p. m. he received a call about the shooting and that when he responded, he saw two ladies lying on the ground at the scene.

Lt. Billy Joe Coop, also of the police department, testified that he investigated the area immediately after the shooting, looking for evidence. He further stated that he had sent the bullets and casings introduced in State's exhibits, to the State Bureau of Investigation.

After the State's evidence was concluded, the defendant demurred to the evidence and submitted a Motion to Dismiss. When the Motion was overruled, he reinstated his plea of not guilty by reason of insanity.

In defendant's behalf, Dr. Max Glaze, a psychiatrist on the staff of Muskogee General Hospital, testified that he had examined the defendant five times for periods ranging from one to one and one-half hours, prior to the trial. Dr. Glaze stated that on the day of the incident, defendant was depressed and had stayed home from work. Later in the day he had gone to the Naval Ammunition Depot where he was employed, and picked up his paycheck. From there he went to the pawn shop and reclaimed a gun he had left there. The

witness testified that the defendant was in the habit of pawning the gun whenever he needed money, and then reclaiming it when he was paid. Defendant had told the witness that prior to the shooting he had just gotten the gun from the trunk of the car and was going to carry it into the house when he saw his wife and her mother walking down the street. He then walked out to the street to meet them. When he reached them, he had taken hold of his wife's hand to lead her into the house to talk to her about a possible reconciliation between them when his mother-in-law tried to pull them apart. Defendant told Dr. Glaze that Mrs. Anderson then began swinging her purse, or a package, at him, striking him. The psychiatrist testified that he felt that at this point something snapped inside the defendant and that "he did not have comprehension of what he was doing and was unable to reason, to see what the consequences of his act would be." Dr. Glaze also said that he felt the killing of defendant's wife was unintentional, but that he probably did intend to shoot his mother-in-law. In explaining the psychological background of the defendant, the witness recounted that during the 17 year marriage of the Coopers, the defendant had felt threatened by his mother-in-law whom he felt had never approved of him and had repeatedly tried to destroy his marriage.

Following this witness, the parties stipulated that on June 16, 1972, the defendant had cashed his paycheck at Clifton Grocery as testified to by owner Don Clifton. It was also stipulated that Steve Stephens of Stephen's Pawn Shop, had testified that on June 16th the defendant had gotten his .38 pistol from the pawn shop.

The final witness called by the defendant was Raphael "Ray F." Cooper, brother of the defendant, who testified that he was at the scene of the shootings and witnessed what happened. Mr. Cooper said that on the day of the shootings the defendant had borrowed his car so he could go look for an apartment because he thought that he

and his wife were going to go back together, but she had insisted that if they did, she wanted to move into a new apartment. Immediately before the incident, Ray Cooper testified that his sister, who lives across the street from the Cooper residence, came over to his parent's home where the witness was sitting on the front porch with his mother. His sister told him to stop the defendant and Mrs. Anderson from fighting; that they were arguing on the sidewalk beside the house. Mr. Cooper said he did not go investigate, although he heard loud talking. Then he heard two or three shots fired, so he jumped off the porch and ran to the side of the house where he saw Mrs. Anderson lying on the ground and defendant and his wife "tusseling" over the gun. Mr. Cooper said he yelled at them but at the same time another shot went off and then another. As Mrs. Cooper slumped to the ground, the defendant put the gun to his own head and Ray Cooper yelled at him to stop and started walking toward him. The defendant turned the gun toward his brother and told him not to come any closer, threatening to kill him if he did. The witness said he stopped and the defendant again put the gun to his head, when the defendant's son, Earl, Jr., ran out the back door and jumped on the back of his father, allowing the witness to take the gun from him, which he did, taking the gun into the house. While in the house, he called the police and an ambulance because Mrs. Cooper was still alive. When Ray Cooper returned to the scene outside he saw that the defendant had taken his wife into his arms and proceeded to rock her back and forth in his arms until the police car arrived.

At the close of defendant's case, the State called the final witness, Dr. R. M. Garcia, chief of forensic psychiatry at Eastern State Hospital in Vinita, who testified that the defendant had been under observation at the institution from October 2, 1972 to December 8, 1972, and in the opinion of the hospital personnel, at the

time of the shooting, he knew right from wrong.

In his first proposition of error, defendant alleges that the trial court erred in refusing to grant a change of venue made upon proper motions prior to and during the trial.

▮ Defendant alleges that due to newspaper articles appearing in local papers February 18th and 19th prior to empanelling the jury on February 20th, and during the trial on February 22nd, he did not receive a fair and impartial jury. The record shows, however, that a total of 56 jurors were interviewed on voir dire and that 27 were dismissed because they had read the questionable articles. Before voir dire began, the trial court ruled as follows (Tr. 13):

"I don't intend for any person that has read that paper to sit on this jury. I don't think any person that has read the issue of Feb. 19 should sit as a juror in this case, to sit and be impartial."

The pertinent part of 22 O.S. § 662, provides:

"No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court upon his declaration under oath or otherwise that he can and will notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him . . . ."

The measures taken by the trial judge went beyond what was necessary to prevent possible prejudice caused by the articles.

Although defendant cites two Oklahoma cases where the denial of change of venue was grounds for reversal on appeal, the great weight of authority relies upon the discretion of the trial court to grant a change of venue and in the absence of proof that the results were prejudicial, the decision will not be overturned on appeal. See Sam v. State, Okl.Cr., 510 P.2d 978 (1973). We have found, upon thorough examination of the record, that sufficient effort was made through voir dire examination of prospective jurors to assure that defendant received a fair and impartial panel as required under 22 O.S. § 561.

This Court, in upholding the denial of a change of venue in Shapard v. State, Okl. Cr., 437 P.2d 565 (1968), stated:

"In applying the rules set forth in Irvin v. Dowd [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)], and on the basis of a thorough study of the record of the voir dire examination of the jurors selected to whom the case was ultimately submitted, we are of the opinion that the defendant's contention that he did not receive a fair and impartial trial by reason that a fair and impartial jury could not be obtained from the inhabitants of Canadian County, is not supported by the record. The jurors who were extensively examined by defense counsel, who was given wide latitude, as to their qualifications *all* stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed."

In the instant case all the jurors seated said that they would not be influenced by anything besides the evidence presented and all said that they presumed the defendant innocent. As a matter of record, in addition to the 28 prospective jurors excused for having read the articles, another eight were excused for having formed opinions.

▮ In Fowler v. State, Okl.Cr., 512 P. 2d 238 (1968), the defendant in a murder trial contended that a fair trial was not had due to pre-trial publicity. The record in that case revealed that 74 prospective jurors were examined, 28 had heard about the case, 10 evidenced an opinion as to the defendant's guilt and only four expressed a positive opinion of guilt. This Court held

that defendant did not show, as a matter of law, that prejudicial publicity had so permeated Garvin County as to render the verdict inherently suspect. Further, in Fowler v. State, supra, we stated:

"An examination of the record reflects no showing by defendant that there existed actual jury prejudice, i. e., an identifiable prejudice towards the accused. It is therefore the opinion of this Court that defendant failed to sustain his burden of proof, . . . ."

In addition to his pre-trial Motion for change of venue, defendant also contends that there was error in denying his renewed Motion for change of venue made during the trial in response to newspaper articles appearing February 22nd concerning the progress of the trial. The record shows that prior to every recess or adjournment, the jury was duly admonished by the trial court to refrain from reading about, or discussing the case, which, under 22 O.S. § 853, is sufficient. Further, there is no record of defendant's objection to the separation of the jury so the right to sequestration was waived. See French v. State, Okl.Cr., 416 P.2d 171 (1966) and Smith v. State, Okl.Cr., 368 P.2d 246 (1961).

We accordingly find defendant's first contention to be without merit and that a fair and impartial jury was had.

The second proposition urged by defendant is that the trial court erred in not granting a mistrial which was requested after a spectator, in the presence of the jury, engaged in improper conduct allegedly prejudicial to the defendant. The complained of conduct occurred when the spectator, apparently the sister of defendant's deceased wife, interrupted the testimony of Patricia Cooper, daughter of the defendant, who had just testified in regard to the question of whether her father had a violent nature, and had said, "I wouldn't say it was violent, really." (Tr. 271). At that point, "A FEMALE SPECTATOR HYSTERICALLY CRYING AND TALKING LOUDLY" (Tr. 271) said, "It is not true. He always beat her. He always beat her."

The record shows that after the outburst the court was recessed. Further, the spectator responsible was banned by the trial judge from the courtroom for the remainder of the trial. After court reconvened the trial judge admonished the jury to disregard the outbreak and further admonished the spectators not to engage in further outbreaks, stating:

"Ladies and gentlemen of the jury, there has been a happening here that was not planned and is not part of this trial in any way topside or bottom and it will not be considered by the jury as evidence of anything. I do not intend to have any more outbreaks like this in this courtroom; if it is necessary we will file a contempt proceeding. I will not tolerate any more outbreaks of this nature in this courtroom." (Tr. 278)

Defendant, in his brief, concedes that "not every outbreak or grief manifestation during the course of the trial that has an emotional air about it is ground for a mistrial. It sometimes may be cured by action and admonition of the trial judge." We find, in considering the record in this case, that appropriate admonition was given to overcome any prejudicial effect of the outburst.

An analogy can be made between the outburst complained of in the instant case, and the improper testimony in Kitchens v. State, Okl.Cr., 513 P.2d 1300 (1973), where this Court held that "the court's admonition to the jury not to consider the remarks of counsel or a witness usually cures an error unless it is of such a nature after considering the evidence that the error appears to have determined the verdict." See also McDaniel v. State, Okl.Cr., 509 P.2d 675 (1973).

In view of the overwhelming evidence presented in the instant case, and in view of the admonition given by the court immediately following the incident, it cannot be held to have been prejudicial to the rights of defendant.

Defendant cites Hammond v. State, 26 Ala.App. 391, 160 So. 900 (1935) as authority that an outburst from a spectator is grounds for reversal, but it must be pointed out that in that case the Appellate Court said in reviewing the trial court that it "shows further that no corrective measure was taken by the judge."

For all of the foregoing reasons, we are of the opinion that this assignment of error is without merit.

The third proposition of error alleges that one of the State's witnesses was improperly declared hostile and that the court erred in overruling an objection to an evidentiary harpoon injected by the prosecutor in the subsequent cross-examination of the witness.

The alleged errors occurred during the testimony of Oliver "Mule" Irvin, who after being placed on the stand by the State, was unable to remember any incidents relating to the Cooper incident, although two later witnesses testified that he had come to the police station during the night of the shootings to give them information about it.

 It is generally held that when a witness proves unresponsive to questions or gives answers substantially contrary to what he is expected to give, or has given in the past, the party calling him has the right to express surprise, and it is then within the discretion of the court to allow cross-examination for the purpose of impeaching the witness. See Morris v. State, 35 Okl.Cr. 5, 247 P. 418 (1926). The fact that in the instant case the trial judge interrupted a long series of questions to which the witness had repeatedly answered he "didn't remember" must be interpreted as merely expeditious when taken in context. In his brief, defendant alleges that the trial court declared the witness hostile "on his own," but we find that contention meritless when reading from the record, as follows:

"COURT: I am asking the State if he is asking to declare this witness a hostile witness?

ROBERTS: I guess I'm going to have to your Honor. I hate to do it but I don't see any other way.

COURT: On that basis, I am going to allow cross-examination of this witness who is obviously a hostile witness." (Tr. 338)

Since the witness was properly declared hostile, the subsequent cross-examination of him was without error. A similar situation was dealt with by this Court in Cantrell v. State, Okl.Cr., 462 P.2d 342 (1969) which held that leading and suggestive questions should not be asked a witness by the party placing him upon the stand. "An exception to this rule of law is where the witness proves hostile to the party calling him and friendly to his adversary, or where the witness is trying to evade the questions asked. Then, the trial court, in its discretion, may permit leading questions to be asked."

The record reveals at pages 341 and 342, the following:

"Q. Okay. Did you have occasion to tell or make any statements to Mr. Coop or Mr. Orr concerning Earl Daniel Cooper?

A. No.

Q. You did not tell the officer that the defendant—

STEIDLEY: Your Honor, I object to the form of the question.

COURT: A hostile witness, you are allowed to cross examine. Let us hear the question before we can rule on the objection. State your question.

Q. Did you tell officer Billy Joe Coop and J. B. Orr that Earl Daniel Cooper borrowed $40.00 from you?

COURT: Wait just a minute Mr. Irvin.

ROBERTS: Don't answer it yet.

STEIDLEY: To which we object, it is leading and suggestive and assuming a fact not in evidence, and it is

also immaterial, irrelevant and incompetent.

COURT: Overruled and exceptions allowed.

Q. Okay, let me ask you that question?

A. What is your question?

Q. Did you tell Officer Billy Joe Coop and J. B. Orr that Earl Daniel Cooper borrowed $40.00 from you?

A. No, never in my life.

Q. Did you tell Officer Billy Joe Coop and J. B. Orr that Earl Daniel Cooper told you that he was going to kill someone?

A. No, never in my life."

On cross-examination the introduction of leading questions seeking answers germane to the issue under discussion is not considered to be an "evidentiary harpoon." The questions were germane to the issue, especially since two other witnesses were prepared to testify that the witness had repeated certain allegations concerning the Cooper incident to them on the night of the shootings. Further, the fact that the questions were answered negatively removes the issue raised from the evidence. Accordingly, we find this proposition to be without merit.

In conclusion, in view of the overwhelming evidence presented at trial, and on the basis of the findings previously discussed, we find the defendant's contentions to be without merit, and the judgments and sentences appealed from is affirmed.

BLISS, P. J., concurs.

BRETT, J., concurs in results.