Luther ANDERSON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-75-433.

Court of Criminal Appeals of Oklahoma.

June 21, 1976.

**1156**

S. Daniel George, Sallisaw, Court-appointed, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Douglas L. Combs, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Luther Anderson, hereinafter referred to as defendant, was charged in the District Court, Sequoyah County, Case No. CRF–74–69, with the offense of Murder in the First Degree; defendant was convicted of the offense of Murder in the Second Degree and sentenced to serve a term of Ten (10) years to life in the custody of the Department of Corrections. From said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Dovie Duty, age seventy-eight, testified that on July 2, 1974, she was living with her son Clarence Duty in Muldrow, Oklahoma. She related the day's events, including the visit of the defendant during the afternoon. They left the home together and Clarence returned approximately an hour and a half later by himself. He ate his supper and went to bed shortly before 10:00 p. m. At approximately 10:30 p. m. she heard a knock on the door and upon opening the door found the defendant standing outside. Defendant said, "Where's Clarence?" She replied, "Well, he is in there in the bed maybe asleep." Defendant said, "I'm going to kill the God-damned Son-of-a-Bitch, and then I am agonna kill, I'm agonna rape you and eat your face all to pieces and kill you." [Tr. 332] She testified that she had an axe sitting near the duofold in the front room of the house and further related that the defendant had been present when her son sharpened the axe. The only thing that she remembered after that was defendant having her on the bed where Clarence had been lying. She testified that she

was injured and spent three weeks in the hospital recovering from her injuries.

Roger Duty, age fourteen, testified that he lived in Muldrow a couple of blocks from his grandmother Dovie Duty. He had been acquainted with the defendant for approximately three weeks. His younger brother Bobby went to his grandmother's house at approximately 10:10 p. m. and returned shortly thereafter. He went to his grandmother's house to investigate and found his uncle with an axe in his head and his grandmother sitting on a bed in the back bedroom. The defendant came into the room, knocked him down and jumped on his grandmother. Defendant then chased him from the house threatening to kill him if he returned. He testified that the defendant was covered with blood. He ran down the road and informed his mother of his observations.

Helen Duty testified that she went to Dovie Duty's house at approximately 10:15 p. m. after having learned of some trouble through her son, Bobby. Upon entering the house, she observed the defendant come out from the back bedroom door. Defendant threw something at her and she tripped over a coffee table. Defendant grabbed her, forced her outside and raped her. Defendant advised her that he had killed Clarence and tried to have intercourse with "grandma." [Tr. 368] She managed to escape from the defendant and was subsequently taken to the hospital.

Dr. William Wilson, Sequoyah County Medical Examiner, testified that he observed the body of Clarence Duty on the evening of July 2, 1974, at Duty's home in Muldrow. Duty was dressed in a T-shirt with brief shorts and had a double bitted axe imbedded in the left side of his head. He testified that he was present the following day when an autopsy was performed and stated that the cause of death was "multiple, massive axe wounds to the head." [Tr. 384]

State's Exhibit No. 3 was identified as the double bitted axe which was removed from the head of Clarence Duty.

Robert Bean, an investigator for the District Attorney's Office, testified that he assisted in the investigation of the homicide at the Duty residence. He identified two pictures of Dovie Duty which were taken at the hospital approximately two weeks after the incident, and State's Exhibit No. 3, the axe.

Sheriff Ade Walters testified that he also assisted in the investigation at the Duty residence. He described his observations of the residence and identified certain items of evidence.

Jim Lowder, the City Marshall of Muldrow, testified that he was called to the Duty residence on July 2, 1974, some time after 10:00 p. m. He observed Dovie Duty standing in the yard bleeding profusely from the face. He searched the immediate area for the defendant. While conducting the search, a nurse from the nearby nursing home attracted his attention. Upon entering the nursing home, he found the defendant lying in a bed with the covers over him.

The defense called Dr. Joseph Dorzab, a psychiatrist, who testified that he was appointed by the court to examine the defendant. That as a result of his examination he found that the defendant had brain damage, a lower than normal intelligence, was illiterate, unskilled and an alcoholic. He testified that the defendant was subject to rage reactions after consuming alcohol. The defendant understood right from wrong and was able to understand the judicial system, with one exception, that being that he had a definite loss of memory for July 2, 1974. In response to a hypothetical question which generally covered the testimony of the State's witnesses, the doctor testified that in his opinion the defendant would not have known right from wrong on the night in question.

Stella Mitchell testified that she was living in a nursing home in Muldrow on July 2, 1974; that the defendant came into her room and was covered with blood. He got into a bed and pulled the covers up over

his head as if to hide. She testified that in her opinion the defendant was doped.

Sheriff Ade Walters testified that he was present at the preliminary hearing and that Dovie Duty had some difficulty in identifying the defendant.

In rebuttal, Dr. Lorraine Schmidt, Chief of the Department of Forensic Psychiatry at Central State Hospital, testified that her institution examined the defendant from July 3, 1974 until July 18, 1974; that, in her opinion, defendant did not have brain damage and was not psychotic and was able to determine right from wrong.

Leo Matlock testified that he assisted in the arrest of the defendant on the evening of July 2, 1974. He transported the defendant to Sallisaw from the nursing home. He further testified that he did not notice anything unusual or abnormal about the way the defendant acted.

Roger Duty and Helen Duty both testified that the defendant did not appear to be abnormal on the night in question, but rather appeared to have been frightened.

■ In the first assignment of error it is asserted that the trial court erred in failing to sustain defendant's first Demurrer to the Information. Defendant complains that the Information fails in two aspects, first, the death of Clarence Duty was not the result of the attempted rape of Dovie Duty, therefore making the Murder in the First Degree Statute, 21 O.S.Supp. 1974, § 701.1 inapplicable and secondly that the Information does not detail the acts that the defendant allegedly performed on Dovie Duty which would constitute an attempted rape. We disagree. The Information states, in part, as follows:

" . . . That is to say, the said LUTHER ANDERSON in the County and State aforesaid, and on or about the date aforesaid, then and there being, did then and there unlawfully, wilfully and feloniously, without authority of law and with a premeditated design to effect the death of one Clarence Eugene Duty, the said LUTHER ANDERSON did while being then and there engaged in attempting to commit the crime of Rape by then and there unlawfully, wilfully and feloniously with the use of force and violence to Dovie Duty, a female person not the wife of the said defendant, overcome all resistance on the part of the said Dovie Duty and did then and there attempt to rape, ravish, carnally know and have sexual intercourse with said Dovie Duty against her will and consent, did kill the said Clarence Eugene Duty by striking him in the head with an axe causing mortal wounds in the body of the said Clarence Eugene Duty from which mortal wounds the said Clarence Eugene Duty did languish and die . . . "

We are of the opinion that the above stated Information meets all the requirements of 21 O.S.Supp.1974, § 701.1 which states in pertinent part:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, *or of any other human being,* is murder in the first degree in the following cases:

1. * * *

2. When perpetrated by one committing or *attempting to commit rape,* kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;

* * * " [Emphasis added]

We are of the opinion that the Legislature intended to cover the contingency of killing a third person while attempting to rape another.

We further observe that the Information sufficiently informs the defendant of the offense with which he is charged with such particularity as to enable him to prepare for his trial, and so defines and identifies the offense that, if convicted or ac-

quitted, he would be able to defend himself against any subsequent prosecution for the same offense. See *Bennett v. State*, Okl. Cr., 492 P.2d 340 and *Tolleson v. State*, Okl.Cr., 400 P.2d 576. We, therefore, find this assignment of error to be without merit.

In the second assignment of error it is contended that the trial court erred by failing to sustain defendant's plea in abatement, motion to quash and set aside the information. Defendant argues that this assignment should be sustained for the same reasons as set forth in the first assignment of error. We likewise find this assignment of error to be without merit.

■ The defendant contends in his third assignment of error that the trial court erred by refusing to allow him to take a polygraph test. Defendant cites as authority the case of *Castleberry v. State*, Okl. Cr., 522 P.2d 257. The question of admissibility of polygraph tests was finally put to rest by this Court in *Fulton v. State*, Okl.Cr., 541 P.2d 871, wherein we stated:

" . . . However, in light of the potential unreliability of polygraph examinations at this time, we feel that in all future cases the introduction into evidence of polygraph examination results for any purpose, even if admitted upon stipulation of all parties, will be error. This holding departs from our previous decisions in *Castleberry, supra,* and *Jones,* [*v. State*, Okl.Cr., 527 P.2d 169] *supra,* therefore, *Castleberry, supra,* and *Jones, supra*, and all other cases, are overruled insofar as they are inconsistent with the views expressed today. . . . "

■ In his fourth assignment of error it is contended that the trial court erred by refusing to grant defendant's motion for change of venue based upon the widespread pre-trial publicity. Defendant timely filed his motion for change of venue, which the trial court properly reserved its ruling until after the completion of the voir dire. We have carefully examined the trial transcript of the voir dire examination which contains 300 pages. The transcript reflects that all of the jurors were extensively questioned by both counsel for the State and defendant, as well as by the court. Each juror selected affirmatively stated that he or she could render a verdict based solely upon the evidence presented at the trial. In *Cooper v. State,* Okl.Cr., 524 P.2d 793, we quoted from our decision in *Shapard v. State,* Okl.Cr., 437 P.2d 565, wherein we stated: ·

" 'In applying the rules set forth in *Irvin v. Dowd* [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)], and on the basis of a thorough study of the record of the voir dire examination of the jurors selected to whom the case was ultimately submitted, we are of the opinion that the defendant's contention that he did not receive a fair and impartial trial by reason that a fair and impartial jury could not be obtained from the inhabitants of Canadian County, is not supported by the record. The jurors who were extensively examined by defense counsel, who was given wide latitude, as to their qualifications *all* stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed.' "

We, therefore, find this assignment to be without merit.

■ Defendant contends in his fifth assignment of error that the trial court erred in overruling his Motion in Limine to prohibit the testimony of Helen Duty as to the alleged rape. We are of the opinion that the court's ruling was proper. The evidence at the trial clearly adduced a· very short time sequence between the arrival at the deceased's home by the defendant, the homicide of the deceased and the rape of Helen Duty. We have previously recognized the exceptions to the general rule prohibiting the introduction of evidence of

other crimes or offenses. These exceptions were restated in *Moulton v. State,* Okl.Cr., 476 P.2d 366 (1970), wherein, we stated:

" . . . However, evidence of separate and similar offenses is admissible when it is material and proper to show (1) motive, (2) intent, (3) absence of mistake or accident, (4) identity of person charged with the commission of the crime for which an accused is put on trial, and (5) common scheme or plan embracing the two or more crimes so related to each other that proof of one tends to establish the other. . . . "

█ It is asserted in the sixth assignment of error that the trial court erred in allowing the introduction of two pictures of Dovie Duty which were taken thirteen days after she was allegedly attacked by the defendant. Defendant argues that the only purpose in introducing the pictures was to arouse the passion of the jury. We need only observe that this assignment is not properly before us inasmuch as the pictures do not appear in the original record and transcript. We have previously held that it is incumbent on the defendant in seeking appeal to present sufficient record before the reviewing court in order to determine the issues raised. *Pierce v. State,* Okl.Cr., 495 P.2d 407 (1972).

█ The defendant asserts in his sixth assignment of error that the trial court erred in allowing the introduction of the axe into evidence because of the lack of connection shown between defendant and the axe. We observe that this assignment is not supported by the citations of authority. We have previously held that where this is not done and it is apparent that defendant has not been deprived of any fundamental rights, this Court will not search the books for authorities to support assertions of error in the trial court. *Sandefur v. State,* Okl.Cr., 461 P.2d 954 (1969).

Although this assignment is improperly before this Court, we observe that circumstantial evidence did connect the defendant

with the murder weapon and that the axe was properly admitted into evidence. In *Richmond v. State,* Okl.Cr., 456 P.2d 897 (1969), we quoted with approval from *Wharton's Criminal Evidence,* 12th Edition, Vol. 2, § 675, pgs. 616–617, which states:

" ' . . . *If a question of fact as to the connection of the article sought to be admitted with the defendant or the crime is raised, the evidence should be admitted for the determination of the jury.* The lack of positive identification in such a case affects the weight of the article or substance as evidence, rather than its admissibility.' [Emphasis added]."

█ In the final two assignments of error defendant asserts that the trial court erred in failing to sustain his Demurrer to the evidence and that the trial court erred in giving an instruction to the jury on the charge of Murder in the First Degree. In support of these assignments defendant reurges the argument and authorities set forth in assignments one, two and five. We have previously considered these assignments and found them to be without merit. We therefore find the final two assignments of error to be likewise without merit.

In conclusion, we observe that the record is free of any error which would require reversal or justify modification. The judgment and sentence is accordingly *AFFIRMED.*

BRETT, P. J., concurs.

BLISS, J., specially concurs.

BLISS, Judge (specially concurring):

I concur generally in this Opinion and specially in its holding that the State's evidence in the case, if believed, supports the alleged crime of Murder in the First Degree and, therefore, warranted the Magistrate in binding the defendant over for the crime, the trial court in overruling the Motion to Quash and Set Aside the Informa-

tion and in submitting the issue to the jury. The evidence, if believed, sustains the State's theory that the killing of Clarence Duty by the defendant was an overt act by him in an attempt to rape the mother, Dovie Duty, and, therefore, the homicide was perpetrated by him while attempting to commit the crime of rape.

As stated in *Taylor v. State*, 96 Okl.Cr. 188, 251 P.2d 523 (1953), the elements of an "attempt to commit a crime" are intent, performance and some act toward consummation of the crime and failure to consummate its commission.

Further, this Court held in *Dunbar v. State*, 75 Okl.Cr. 275, 131 P.2d 116 (1942), as follows:

> "It is also well settled that the overt act must be something more than mere preparation or planning the crime. It must be something done, some step taken beyond preparation, that directly moves toward the crime and brings the accused nearer to its commission than mere acts of preparation or of planning. It must be such act or acts as will apparently result, in the usual and natural course of events, if not hindered by extraneous causes, in the commission of the crime itself."

Under the State's theory, defendant intended to commit the crime of rape, his victim's son, Clarence Duty, stood in his way and was a barrier to his purpose, homicide eliminated him and was an overt act toward the commission of a crime, though not consummated. For this theory the State relied on its witnesses who quoted the defendant as follows: "I'm going to kill the Goddamned Son-of-a-Bitch, and then I am agonna kill, I'm agonna kill, I'm agonna rape you." Later he summarized his acts by saying he had killed Clarence and had tried to have intercourse with "grandma and couldn't."

As held in the Opinion, there was no merit in the first and second assignments of error.