2007 OK CR 42

**Carlis Anthony BALL, Appellant**

**v.**

**STATE of Oklahoma, Appellee.**

**No. F–2006–344.**

Court of Criminal Appeals of Oklahoma.

Nov. 14, 2007.

An Appeal from the District Court of Tulsa County; The Honorable P. Thomas Thornbrugh, District Judge.

Pete Silva, Public Defender, Sid Conway, Asst. Public Defender, Tulsa, OK, attorneys for defendant at trial.

Brandon Whitworth, Brian Kuester, Assistant District Attorneys, Tulsa, OK, attorney for the State at trial.

Stuart Southerland, Asst. Public Defender, Tulsa, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jay Schniederjan, Assistant Attorney General, Oklahoma City, OK, Attorneys for appellee on appeal.

### OPINION

LEWIS, Judge.

¶ 1 Carlis Anthony Ball, Appellant, was tried by jury and found guilty in the District Court of Tulsa County, Case No. CF–2005–2586, of Count I, murder in the first degree, in violation of 21 O.S.Supp.2004, § 701.7(C); and Count II, child neglect, in violation of 10 O.S.Supp.2002, § 7115(C). The jury sentenced Appellant to life imprisonment without possibility of parole in Count I and life imprisonment in Count II. The Honorable P. Thomas Thornbrugh, District Judge, pronounced the judgment and ordered the sentences served consecutively. Mr. Ball appeals.

*Facts*

¶ 2 Appellant lived in a Tulsa apartment with his four children. Keenan Taylor, the youngest, was almost three years old. Around 4:25 p.m. on June 9, 2005, Appellant placed a frantic call to 911. On the recording, Appellant intermittently shrieks in apparent horror and pleads incoherently, but gives the operator his address and says "My son—and I, I spilled some water on him yesterday but I didn't want to go to jail so I (unintelligible)." Appellant then returned to the child's side as his neighbor, Angela Wykoff, came on the line, begging rescuers to come quickly. Ms. Wykoff, whom Appellant had summoned from her apartment upstairs, was unsure what had happened. She relayed the operator's directions and questions to Appellant, and repeated Appellant's answers on the line. Appellant is heard on the tape again saying he spilled "boiling hot water" on the child. When asked if the child had vomited, Appellant states that "yes, he's been vomiting and—he's, he's been shitting too, I don't know what the fuck he ate . . . (unintelligible)." Wykoff also repeated to the 911 operator Appellant's statement that the child bit his lip. Wykoff described the child's skin as "all pink" and "scorched" all over. Ms. Wykoff described the child at one point as struggling for breath.

¶ 3 First responders found Keenan naked on the apartment floor, and could see he was severely burned. Fire Captain Gretta Hurt started CPR on Keenan as her crew unloaded rescue equipment. When she heard EMSA arrive, Captain Hurt scooped him into her arms and ran for the ambulance. EMSA Paramedics and other firefighters continued lifesaving efforts, but Keenan's vital signs slipped away.

¶ 4 Captain Hurt escorted Appellant into his apartment to get more information. Appellant told her that on the night before he had boiled water for macaroni and cheese, but changed his mind. While taking the water off the stove, the pot slipped from his hand, spilling on Keenan, who had been standing right behind him. Appellant said he failed to seek medical care because he was afraid he would get into trouble.

¶ 5 Firefighter Loren Parker continued CPR on Keenan after Captain Hurt had transferred Keenan to the ambulance. Appellant, highly agitated, forced his way into the ambulance. Appellant told Parker that Keenan had pulled a pot of boiling water onto himself the night before. Paramedic Michael Kisler testified that Appellant said he had "dunked" Keenan in cold water and Keenan had begun to vomit; that Keenan's skin began to "sluff off;" and that Keenan lost consciousness just before Appellant called 911. Kisler told Appellant to leave the ambulance so they could save his child. The rescuers rushed Keenan to Hillcrest Hospital, but he never regained consciousness. Around 5:07 p.m., Keenan was pronounced dead.

¶ 6 After the ambulance left, Appellant lay in the street screaming "Help my baby, help my baby." Appellant's girlfriend, Lakeishia Thomas, who lived in a nearby apartment, went to his side and helped him back to his apartment, where he spoke with Assistant Fire Marshal Curtis Ozment. Appellant told Ozment how he had spilled boiling water on Keenan, adding that he tried to treat the burns with cool water and alcohol. Police later recovered an empty bottle of hydrogen peroxide and some pain relievers in the apartment, but never located any rubbing alcohol.

¶ 7 Post-mortem examination showed that Keenan had suffered severe thermal injury from water scalding to more than half of his body, including his head and face, neck and upper arms, torso, genitals, and buttocks. Forensic pathologist R.F. Distefano, D.O., who conducted the autopsy, found evidence of active debridement, or removal, of Keenan's scalded skin. He also noted other injuries: two areas of subdural hematoma with a healing process suggesting infliction approximately four or five days before death; two other scalp injuries of indeterminate origin; and a complex laceration of the lower lip with a healing process suggesting injury four or five days prior to death. Dr. Distefano concluded that the pattern of burning indicated a deliberate pouring of scalding water rather than an accidental spill. The need for imme-

diate care to the severe injuries Keenan suffered would have been apparent to an adult.

¶ 8 Police investigators testified that on the evening of Keenan's death, Appellant's kitchen floor appeared dry and dirty with no indication of a recent water spill. Detectives did find a large area of wet carpet in a bedroom. In the closet of that bedroom, they recovered samples of what proved to be human blood and feces from the closet walls, the door knob, and a white towel. On a drywall sample recovered from the closet, detectives located human skin. Subsequent DNA analysis matched Keenan's genetic profile to stains on the drywall and the doorknob, and to the piece of skin.

¶ 9 Several days after the death, detectives returned to the apartment. They decided to pour boiling water on the kitchen floor and see what would happen. The boiling water did not peel, melt, or blister the flooring. It ran from the center of the floor and pooled in the southeast corner, washing dirt and particulate matter away with it, leaving a visible area of the floor affected by the water.

¶ 10 The State also presented the testimony of Dr. Robert Block, a longtime Child Abuse Medical Examiner. Dr. Block gave his professional opinion that the injuries to Keenan were inflicted by pouring scalding hot water on the child. He also testified to his professional opinion that the injuries were painful and not accidental; would have caused visible distress including the vomiting and diarrhea described by Appellant; and that the need for immediate medical care would be obvious to someone who came in contact with the child.

¶ 11 Lakeishia Thomas, Appellant's girlfriend, testified to several contacts with Appellant on the day before Keenan's death. She spent time with Appellant and his children at his apartment on the morning of June 8, 2005. She returned to her apartment when her children came home from school. She borrowed salt from Appellant around 8:30 p.m. while making dinner. Appellant passed the salt to her through the door. She noticed that he looked upset. She returned the salt, which he again took from her at the door. She had seen Keenan and Appellant's other children earlier in the day, but apparently did not see them at any time that evening.

¶ 12 Appellant came to Lakeishia Thomas' apartment around 1 a.m, June 9, 2005. He still seemed sick. He lay down on her bed, and soon vomited in a trash can. When Lakeishia asked Appellant what was bothering him, he said "I always do this when I have a bad feeling," and said he was upset about Lakeishia possibly dating another man. Lakeishia and Appellant returned to his apartment, watched a movie together, and went to bed. Appellant awoke her before dawn and the two had sex, after which she returned to sleep. Lakeishia apparently left the apartment sometime that morning, again without seeing Keenan or the other children. She did not see Appellant again until after the emergency crews arrived later that afternoon.

¶ 13 Appellant called no witnesses and did not testify.

### Analysis

¶ 14 Appellant's first proposition argues the District Court erred in admission of expert testimony on the nature of Keenan's injuries and the manner in which they were inflicted. Appellant's primary complaint is that the Court admitted the opinion of both physicians that the fatal injuries were purposely inflicted by pouring scalding water on Keenan, rather than the accidental spill injury described by Appellant in his 911 call and subsequent statements.

¶ 15 Expert testimony, opinion or otherwise, is admissible when it will "assist the trier of fact to understand the evidence or to determine a fact in issue ..." 12 O.S. 2001, § 2702. Expert opinion is inadmissible where it merely tells the jury what result to reach, *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109, but is not objectionable merely because it embraces an ultimate issue to be decided by the jury. 12 O.S.2001, § 2704; *Johnson v. State*, 2004 OK CR 25, ¶ 16, 95 P.3d 1099, 1104. Admission of expert testimony according to these controlling principles is within the trial court's discretion. *Davis v. State*, 2004 OK CR 36, ¶ 30, 103 P.3d 70, 79.

¶ 16 In *Revilla v. State*, 1994 OK CR 24, 877 P.2d 1143, a child abuse murder trial, the State presented testimony from three physicians. The emergency room physician described attempts to save the child, and testified based upon information he received and his examination of the child that the injuries were caused by non-accidental trauma. *Id.* at ¶ 19, 877 P.2d at 1150. The Medical Examiner testified to the autopsy findings, as well as the results of a study of head injuries that found approximately 95% of severe head injuries in children are secondary to some kind of child abuse. *Id.* at ¶ 21, 877 P.2d at 1150–1151. Finally, a Child Abuse Medical Examiner testified that he reviewed the autopsy report, medical records, photographs of the injuries, and other information, and concluded the child's injuries did not occur as the appellant had described. *Id.* at ¶ 22, 877 P.2d at 1151.

¶ 17 In *Revilla*, we found no error in the admission of this expert testimony under 12 O.S.2001, § 2702. The testifying physicians were qualified by education and experience to give expert opinion of the cause of the injuries based on clinical observations, professional literature, and the available medical history. We also noted in *Revilla* that the doctors were subject to cross-examination, and the jury was fully informed as to the use and weight of expert opinion testimony. *Id.* at ¶¶ 20–23, 877 P.2d at 1150–1151.

¶ 18 We find it significant that "[t]he ordinary juror would not have the knowledge or expertise of a doctor who had examined numerous children" who have suffered a scalding injury. *J.J.J. v. State*, 1989 OK CR 77, ¶ 8, 782 P.2d 944, 946. The evidence that Appellant purposely poured water on Keenan was largely circumstantial. Appellant gave conflicting statements, claiming at one point that Keenan spilled water on himself, and at another that he spilled the water on Keenan in a cooking mishap. The experts testified that the injuries they observed on Keenan were inconsistent with Appellant's statements and consistent with a person pouring

scalding water. This testimony did not simply tell the jury what result to reach; it provided conclusions drawn from "scientific, technical or other specialized knowledge," to assist the judges of fact in resolving conflicting information about the nature of Keenan's injuries. 12 O.S.2001, §§ 2701, 2702.

¶ 19 Expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts. Such testimony often figures importantly in cases of child abuse. *E.g., Fairchild v. State*, 1999 OK CR 49, ¶¶ 58–65, 998 P.2d 611, 624–625; *Schultz v. State*, 1988 OK CR 17, ¶ 8, 749 P.2d 559, 562. That a proper expert opinion supplies a strong inference of guilt or innocence is no bar to its admissibility. *E.g., Cannon v. State*, 1998 OK CR 28, ¶¶ 19–20, 961 P.2d 838 (finding expert opinion that crime scene was inconsistent with statements made by defendant was properly admitted); *Welch v. State*, 2000 OK CR 8, ¶¶ 21–23, 2 P.3d 356, 368–369 (detective's opinion testimony that death was not accidental but intentionally inflicted properly admitted and based on specialized knowledge of homicide investigations).

¶ 20 Appellant cites our statement in *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, another child abuse homicide, that "unless a defendant raises a cognizable defense such as voluntary intoxication or insanity, an expert should not offer an opinion on whether the defendant's actions were intentional." *Id.* at ¶ 11, 992 P.2d at 395. In *Malicoat*, the defendant denied intent to kill the child, but some injuries to the child (such as bites) were clearly intentional. We found expert opinion that defendant intentionally inflicted the injuries was harmless error. *Id.* Unlike the defendant in *Malicoat*, Appellant consistently offered a "cognizable defense," in statements at the scene, in opening statement, and in closing argument: Keenan's death was a tragic accident, not a crime. Accident has been a defense to murder since the dawn of common law.[1] *Malicoat* has no application here.

1. 21 O.S.2001, § 731. (Homicide is excusable when committed by accident and misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without unlawful in-

tent); *Turner v. State*, 1912 OK CR 370, 8 Okl.Cr. 11, 23, 126 P. 452, *citing* W. Blackstone, *IV Cooley's Blackstone (Commentaries on the Laws of England)* 195: "It were endless to go through

¶ 21 The expert testimony properly rebutted Appellant's claimed defense by tending to show that Keenan's injuries were not inflicted in the manner described by Appellant. The jury was properly instructed about expert testimony and its duty to weigh all testimony in reaching its own conclusions. OUJI–CR(2d) 9–42. The jury must decide which inferences are properly drawn from the testimony under the Court's instructions and the arguments of counsel. Admission of expert opinion testimony that Keenan's injuries were not accidental was not an abuse of discretion.

¶ 22 Appellant also argues that the expert testimony was tainted by the doctors' reliance on statements by Appellant that were ruled involuntary and ultimately suppressed. The record refutes this claim. Although the doctors testified *in camera* that they examined evidence which included (or may have included) the suppressed statements, the District Court prohibited any reference to the statements or their contents. Both doctors' opinions were based on their observations of the injuries and other data, were not affected by the suppressed statements, and would have remained the same in any case.

■ ¶ 23 With respect to Appellant's objections that the experts considered suppressed information about Appellant's delay in seeking treatment and his description of how the injuries occurred, such information was also before the jury in Appellant's 911 call and his statements to emergency responders. Appellant has not shown that the doctors materially relied on the suppressed statements, and to the extent that they might have done so, any taint is dissipated significantly because the same information was admitted from untainted sources. *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (finding illegally seized evidence admissible where the same evidence was subject to government subpoena); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (evidence of location of body obtained in illegal interrogation

admissible because body would have been discovered inevitably in extensive search). There is no reversible error here.

■ ¶ 24 Appellant also complains that the District Court erred in admitting expert testimony about injuries other than the burns that resulted in death. He claims this testimony was irrelevant at best, or at worst, evidence of other crimes against Keenan. Our cases are generally to the contrary. *Cf. Malicoat*, at ¶ 11, 992 P.2d at 335 (attending physician in child abuse murder testified to the body's appearance and the extent of the visible injuries); *Revilla*, at ¶¶ 2, 26–28, 877 P.2d at 1146, 1151–1152 (photos depicting injuries were admissible to corroborate forensic testimony, show defendant's attitude toward child, and rebut claim of mistake or accident); *Drew v. State*, 1989 OK CR 1, ¶¶ 1–6, 771 P.2d 224, 226–227 (trial court admitted testimony of other injuries and expert opinion that death was not accidental); *Schultz v. State*, 1988 OK CR 17, ¶ 8, 749 P.2d 559, 562 (same). We find no error in the admission of this evidence. Proposition One is denied.

■ ¶ 25 Propositions Two and Three claim reversible error in the District Court's refusal of Appellant's requested instructions on the defense of excusable homicide and the lesser-included offense of manslaughter in the second degree. We review the determination of instructions to be given to the jury for abuse of discretion. *Revilla*, at ¶ 16, 877 P.2d at 1149. Appellant's theory of defense to the charge of murder, drawn from his statements at the scene, was that he accidentally scalded Keenan, and thus committed no crime. Counsel argued for the second-degree manslaughter instruction on the theory that the jury might find Appellant's handling of the boiling water amounted to culpable negligence resulting in death.

■ ¶ 26 The District Court's refusal of an instruction on excusable homicide is indeed troubling. The State opposed this instruction by arguing, incorrectly, that "[t]his—an

---

all the cases of homicide which have been adjudged, either expressly or impliedly, malicious; . . . and we may take it for a general rule that all homicide is malicious, and, of course, amounts

to murder, *unless where justified by the command or permission of the law; excused on account of accident or self-preservation;* or alleviated into manslaughter . . ." (emphasis added).

accident is not a homicide. It is an accident." The State also urged upon the Court the flawed premise that homicide is excusable *only* when it involves accidental death "in the heat of passion or upon any sudden and sufficient provocation or upon sudden combat . . ." *See* OUJI–CR(2d) 8–29. The District Court appears to have found these objections persuasive in denying the requested instructions. Here we find the District Court abused its discretion.[2]

¶ 27 Homicide simply is the killing of one human being by another. 21 O.S.2001, § 691. Homicide is generally of four kinds: murder, manslaughter, excusable homicide, or justifiable homicide. 21 O.S.2001, § 692.[3] Excusable homicide carries no penalty and is not a crime. Homicide is excusable in the following cases:

1. When committed by accident and misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner.

21 O.S.2001, § 731.

¶ 28 The State's misapprehension of the law of excusable homicide, which apparently influenced the District Court's ruling, is shown by reading the Committee Comment to OUJI–CR(2d) 8–29.

**2.** An abuse of discretion is shown by "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

**3.** *But see* 47 O.S.2001, § 11–903, creating the crime of "negligent homicide" as a specific offense related to operation of motor vehicles.

**4.** Concurring in the result in *Jackson v. State*, *supra*, Judge Lumpkin defined *prima facie* evidence as evidence:
which in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the defendant's claim or

The two subsections of [21 O.S.2001 § ] 731 describe situations *which are generally mutually exclusive*, so, although aspects of both subsections may be applicable in a particular case, the subsections are presented as separate instructions for purposes of clarity. . . . Excusable homicide is distinguished from killings termed justifiable homicide in that the latter involves the taking of life as a matter of right, such as self-defense or other statutorily defined cause, as set forth in section 733 of Title 21. However, "excusable homicide is where death results from a lawful act by lawful means, accomplished accidentally *or* by misfortune *or* misadventure, *or* accomplished with sufficient provocation, with no undue advantage and without unnecessary cruel treatment." *Gaunce v. State*, 22 Okl. Cr. 361, 364, 211 P. 517, 518 (1923). (emphasis added).

¶ 29 Our law protects a defendant's right to an instruction on his theory of defense where there is evidence to support it, even if the evidence is discredited. *Broaddrick v. State*, 1985 OK CR 108, ¶ 9, 706 P.2d 534, 536. A theory of defense instruction must embrace a defense recognized in law, which either exonerates guilt or reduces the charge to a lesser included offense. *Kinsey v. State*, 1990 OK CR 64, ¶ 9, 798 P.2d 630, 632–633. A theory of defense instruction is properly refused if there is insufficient evidence to support it. *Smith v. State*, 1977 OK CR 268, ¶ 10, 568 P.2d 639, 641. When prima facie[4] evidence meeting the legal criteria for the defense is presented, an instruction should be given. *Jackson v. State*, 1998 OK CR 39, ¶ 65, 964 P.2d 875, 892. The evidence may come from any source and should not be

defense, and which if not rebutted or contradicted, will remain sufficient to sustain a judgment in favor of the issue which it supports. *The issues of whether the evidence has been rebutted or contradicted are questions of fact for the jury to decide under proper instructions by the Court.* The Court shall review the evidence presented to determine if the defendant has established prima facie proof of, the defense which would warrant an instruction on the defense *without speculating on whether the jury will find the evidence contradicted or rebutted.* *Id.* at ¶ 14, 964 P.2d 875, 902 (Lumpkin, J., concurring in result) (emphasis added).

weighed by the trial court. *Id.* at ¶ 66, 964 P.2d at 892.

¶ 30 We do not read the District Court's refusal of the request for excusable homicide instructions as a finding of insufficient evidence. The Court was aware of Appellant's voluntary statements and his theory of defense. The Court refused the instruction based on an erroneous conclusion about when accidental death is excusable homicide. By ruling accidental death excusable only when accompanied by sudden heat of passion or sudden and sufficient provocation, the District Court nullified the statutory provision excusing homicide when "committed by accident and misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent." The District Court erred in denying Appellant's request for the uniform jury instructions which carry this law into effect. 21 O.S.2001, § 731(1); OUJI–CR(2d) 8–27, 8–28, and 8–30.

¶ 31 In Proposition Three, we also find the District Court erroneously denied Appellant's requested instructions on second-degree manslaughter. The District Court has a duty to instruct on all requested lesser-included or lesser-related offenses which are supported by the evidence. *Shrum v. State,* 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. First-degree murder under 21 O.S.Supp.2004, § 701.7(C) consists of killing a child under age 18 by willful or malicious injuring, torturing, maiming, or using unreasonable force. In cases of child death, murder under section 701.7(C) and second-degree manslaughter include the inherently related elements of (1) death of a human being; and (2) caused by the act of another. *See* 21 O.S.2001, § 716 (killing of one human being by culpable negligence of another, which is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree). These offenses differ only in whether the act causing the child's death was willful or malicious (in either case, murder) or culpably negligent. Second-degree manslaughter is therefore a lesser-included or lesser-related offense of first-degree murder under section 701.7(C) and should be considered by

the jury under proper instructions where sufficient evidence is shown. *Cf. Shrum,* at ¶ 8, 991 P.2d at 1035 (finding greater and lesser offense are "related" for purpose of jury instructions when in the same class of offenses and closely or inherently related); *Jackson v. State,* 1947 OK CR 47, 84 Okl.Cr. 138, 152–153, 179 P.2d 924, 931 (conflicting evidence on trial for malice murder warranted instructions on manslaughter in the first and second degree).

¶ 32 Like a request for a theory of defense instruction, the proper test of sufficient evidence for instructions on a lesser-included offense is whether *prima facie* evidence of the lesser offense has been presented. *Glossip v. State,* 2001 OK CR 21, ¶¶ 28–29, 29 P.3d 597, 603–604. Again, the District Court's denial of the instruction here is not grounded on a finding of insufficient evidence, but an error of law. The District Court initially ruled that Appellant's statements presented the finder of fact with only two possible inferences:

> The Court: In the committee examples [on second degree manslaughter] they are all doing some kind of lawful act in an unlawful manner … the issue framed to me seems to be that if the defendant's version of what happened is accepted, then it is an accident and he did not commit any kind of act of culpable negligence at all. On the other hand, the only other thing they could find is if it was not an accident, he did it willfully and maliciously in which case it is murder. I don't see the implication of the second degree manslaughter that he engaged in some—it is not just negligence. It is culpable negligence. What did he do that was culpable if his version of the events are accepted?

> Defense Counsel: He did not use the ordinary care that someone doing the same act would use.

> The Court: Okay. I understand your argument.

¶ 33 We find merit in Appellant's argument that his statements, standing alone, did not exclude the inference that he was culpably negligent in causing Keenan's death. Culpably negligent parents (and people generally)

commonly perceive and describe their own actions as purely accidental. Appellant's statements about his handling of the boiling water were sufficient as a matter of law to support an inference of culpable negligence. *Glossip,* at ¶ 29, 29 P.3d at 604 (theory of defense based on defendant's statements denying knowledge of murder until after its commission warranted instruction in murder trial of lesser-related offense of accessory after the fact).

 ¶ 34 In denying Appellant's requested instruction on second-degree manslaughter, the District Court drew a further distinction between culpable negligence and mere negligence that finds no support in our cases. Culpable negligence is simply "the omission to do something which a reasonably careful person would do, or the lack of the usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions." *Harless v. State,* 1988 OK CR 155, ¶¶ 4–5, 759 P.2d 225, 227; *cf.* OUJI–CR(2d) 4–104. In *Nail v. State,* 1925 OK CR 604, 33 Okl.Cr. 100, 105–106, 242 P. 270, 272, this Court held that ordinary negligence resulting in death is sufficient to warrant a conviction for second-degree manslaughter:

When do the negligent acts of an individual cease to be mere negligence and become culpable or criminal negligence? What is the test by which criminal responsibility becomes a consequence of a negligent act? Beven in his excellent work, "Negligence In Law," vol. 3, p. 7, says:

. . . . Criminal negligence per se does not differ from negligence simply. The same negligence, as it affects the individual and the state, is, respectively, gross negligence and criminal negligence. While it is the groundwork of reparation to the private individual, however heinous it may be, it is no more than negligence. So soon as it is the subject-matter in respect of which reparation is exacted by the state, it becomes criminal negligence ... Between criminal negligence, however, and actionable negligence, there is no principle of discrimination, but a question of degree only.

¶ 35 In *Harless,* supra, the Court specifically rejected a requested instruction defining culpable negligence as "more than simple negligence ... that evinces a carelessness and a recklessness amounting to a callous disregard for the life of the victim," finding such language more consonant with the depraved state of mind found in second-degree murder. *Id.* at ¶¶ 4–5, 759 P.2d at 227. An inference that Appellant was guilty of negligence resulting in death was sufficient to warrant instructions on second-degree manslaughter.

¶ 36 It was the District Court's duty "to instruct on every degree of homicide which the evidence in every reasonable view suggested." *Jackson,* 1947 OK CR 47, 84 Okl. Cr. at 152, 179 P.2d at 931. Because the jury might reasonably believe Appellant's statements that he did not spill the boiling water on purpose, and yet conclude that he was culpably negligent in causing Keenan's death, the District Court's refusal of Appellant's requested instructions on this lesser-related offense under these circumstances was an abuse of discretion.

 ¶ 37 In light of the foregoing, we summarily reject Appellant's claim—raised for the first time on appeal—that the evidence warranted instructions on the lesser offense of second-degree murder. No reasonable view of the evidence gives rise to the inference that Appellant's conduct "evinced a depraved mind regardless of human life." 21 O.S.2001, § 701.8. We have already found that the evidence gives rise to competing inferences that Appellant's acts were either willful, criminally negligent, or accidental. We turn to the question of whether the District Court's instructional errors require reversal.

 ¶ 38 Reversal of a criminal judgment for misdirection of the jury is condemned by statute unless the error "has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 20 O.S.2001, § 3001.1. The conclusion that the District Court erred in denying certain jury instructions according to the legal standards prescribed in our cases is one thing; whether that error has "proba-

bly resulted" in a miscarriage of justice or a substantial violation of rights is another.

¶ 39 Appellant's statements, standing alone and unweighed, raised legal defenses for which he requested proper instructions. The District Court should have granted those requests. However, our analysis of the errors on appeal permits a broader perspective about their likely impact on the outcome at trial. Consideration of these instructional errors in light of all the trial evidence and other instructions is appropriate. *Phillips v. State*, 1999 OK CR 38, ¶¶ 68–69, 989 P.2d 1017, 1036–1037.

¶ 40 Appellant's claims of accident form a fleeting, contradictory, and improbable fraction of the trial evidence. The remaining evidence—including the unchallenged consensus of eminent physicians about the purposeful nature of the scalding, and other evidence showing that the water was poured in a bedroom rather than spilled on the kitchen floor—proves Appellant's guilt beyond a reasonable doubt. No flight of imagination is required to believe the jury was entirely unmoved by Appellant's claims of accident.

¶ 41 The jury instructions properly stated the presumption of innocence and the prosecution's burden to prove the elements of both charged offenses beyond a reasonable doubt. Both offenses required findings that Appellant's actions were willful (defined as a "willingess to commit the act or omission") or malicious (defined as wishing "to vex, annoy, or injure another person"). OUJI–CR(2d) 4–37, 4–40D, 4–65A. These instructions cast upon the prosecution the burden to prove a state of awareness and intent antithetical to a finding of accident or negligence, and in effect required the jury to implicitly pass upon Appellant's claims of accident. In light of the evidence as a whole and the remaining instructions, the refused instructions on excusable homicide and second-degree manslaughter would not have changed the outcome. Appellant maliciously scalded a defenseless child and callously secluded him from view of those who might have saved him. Denial of Appellant's requested instructions did not contribute to the verdicts and provides no grounds for reversal. Propositions Two and Three are denied.

¶ 42 Proposition Four argues that Appellant's convictions subject him to multiple punishment for a single criminal act in violation of 21 O.S.2001, § 11 and the constitutional prohibitions against double jeopardy. Okla. Const. art. II, § 21; U.S. Const. amend. V. Section 11 provides in pertinent part:

> [A]n act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, ... but in no case can it be punished under more than one.

¶ 43 We find guidance in *McDaniel v. State*, 1973 OK CR 222, 509 P.2d 675, where the appellant raised section 11 challenges to his convictions for assault, rape, and sodomy. We held in *McDaniel:*

> The assault with a dangerous weapon, the rape, and the sodomy were clearly separate and distinct crimes. The assault was committed on Mills and completed when Mills fell from defendant's car. The act of sodomy and rape were removed by at least four hours from such assault. Furthermore, the proof required for a conviction of rape upon the prosecutrix is quite dissimilar from the proof required for a conviction of assault upon a third party. The proof required for a conviction of sodomy is also dissimilar from the proof required for a conviction of rape. The fact that the sodomy occurred just prior to the rape does not negate the fact that separate crimes were committed ...

*Id.* at ¶ 14, 509 P.2d at 680–681.

¶ 44 Appellant's sentences for murder and child neglect arise not from a single act "made punishable in different ways by different provisions of this code" but rather from distinctly criminal actions punishable as independent crimes defined by statute. Appellant's scalding attack on June 8, 2005, became first-degree murder when it caused Keenan's death. Appellant might well have rushed his son to the hospital immediately and been no less guilty of murder. Appellant's neglect of Keenan's medical needs af-

ter the scalding was a separate breach of a parent's legal duty to provide medical care, of which he could have been guilty even if the child had lived. 10 O.S.Supp.2002 § 7115(C). Our reading of section 11 "does not bar the charging and conviction of separate crimes which may only tangentially relate to one or more crimes committed during a continuing course of conduct." *Davis v. State,* 1999 OK CR 48, ¶ 13, 993 P.2d 124, 127. The fact that these separate crimes were part of a "continuing course of conduct" that ultimately contributed to Keenan's death provides no basis for relief under section 11.

¶ 45 Turning to the claim of double jeopardy, we apply the "same elements" test, i.e., whether each offense requires proof of at least one element that the other does not. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *Davis,* at ¶ 4, 993 P.2d at 125. The same elements test is clearly satisfied here, as Appellant's murder conviction requires elements of killing of a child under age 18 by a willful or malicious injury, torture, mayhem, or use of unreasonable force, while the offense of neglect requires a willful or malicious failure to provide necessary food, shelter, or medical care. 10 O.S.Supp.2002, § 7115(C). Proposition Four is denied.

¶ 46 In Proposition Five, Appellant claims evidence obtained in the search of his apartment was admitted in violation of the protections against unreasonable search and seizure. Okla. Const. art. II, § 30; U.S. Const. amend. IV. He argues the affidavit in support of the warrant did not establish probable cause; the search warrant was a general warrant that failed to particularly describe the things to be seized; and that police exceeded the scope of the warrant by seizing items without probable cause. Appellant executed a written consent to search the apartment on the day of Keenan's death, pursuant to which police initially entered the premises and observed items of potential evidence. Within hours of the initial entry, police obtained and executed a search warrant and seized the evidence admitted at trial. Appellant raised no question in the District Court concerning the propriety of his written consent to search the apartment. He

raises no comparable challenge to his consent on appeal.

¶ 47 A search conducted pursuant to a voluntary consent requires no judicial warrant. *Wilson v. State,* 1987 OK CR 86, ¶ 5, 737 P.2d 1197, 1201. Consent obviates not only the necessity of a warrant, but also waives the constitutional requirement that seizure of any particular items in the search be supported by probable cause. *Kennedy v. State,* 1982 OK CR 11, ¶ 50, 640 P.2d 971, 980; W. LaFave, 3 *Search and Seizure: A Treatise on the Fourth Amendment,* § 8.1, 597, fns. 7 and 8 (3d ed., West 1996) (". . . [A] search by consent is not subject to challenge simply because what was permitted was a 'general exploratory search' beyond that any search warrant could authorize . . . If a valid consent is obtained, then clearly there is no additional requirement of probable cause for the search.").

¶ 48 We will not pass upon what amounts to a hypothetical challenge to a search warrant that was unnecessary. *Tripp v. State,* 1941 OK CR 138, 73 Okl.Cr. 69, 71–72, 118 P.2d 273, 274 (finding search warrant unnecessary, Court would not pass upon whether supporting affidavit was sufficient). We commend the police officers' resort to the judicial warrant process in this instance, but Appellant's own consent authorized their search of the apartment and seizure of evidence found within. The evidence was properly admitted at trial. Proposition Five is denied.

¶ 49 Appellant complains in Proposition Six about the District Court's admission of various items of unfairly prejudicial evidence and testimony. We review only for abuse of discretion and find none. *Davis,* 2004 OK CR 36, at ¶ 30, 103 P.3d at 79. Evidence that Appellant engaged in sexual activity with his girlfriend several hours after scalding Keenan was relevant to Appellant's state of mind and tended to establish the material elements of both offenses.

¶ 50 Evidence of the presence of Keenan's DNA in blood, skin, and fecal matter in and around the small bedroom closet supported the inference that Appellant confined Keenan in this closet after scalding him, not only

neglecting Keenan but also purposely hiding Keenan's condition from others who might have helped him. This post-injury behavior amounts to an admission by conduct that tends to rebut Appellant's claims of accident by showing consciousness of guilt. *Dodd v. State*, 2004 OK CR 31, ¶¶ 33–34, 100 P.3d 1017, 1031; *Paxton v. State*, 1993 OK CR 59, ¶ 12, 867 P.2d 1309, 1317 (efforts to hide or alter evidence are probative of consciousness of guilt).

¶ 51 Testimony about other injuries to Keenan observed during the autopsy was properly admitted to show the nature of the post-mortem examination. *Revilla*, at ¶¶ 26–28, 877 P.2d at 1151–1152. Despite its potentially broader admissibility under our cases, the District Court confined this particular testimony to a basic description of the other injuries and permitted no elaboration on whether these injuries were caused by child abuse. The testimony was not used in any manner unfairly prejudicial to the Appellant. Proposition Six is denied.

¶ 52 In Proposition Seven, Appellant argues the District Court erred in refusing a requested instruction on the applicability of 21 O.S.Supp.2003, § 13.1, the so-called "85% Rule," limiting parole eligibility for certain offenses, including murder and child neglect. In *Anderson v. State*, 2006 OK CR 6, 130 P.3d 273, this Court concluded that this "specific and readily understood concept" should be disclosed in an instruction to jurors when sentencing defendants for qualifying offenses. *Id.* at ¶ 25, 130 P.3d at 283. Anderson involved a first degree murder conviction where the jury sentenced Appellant to life without possibility of parole. In deliberations, "the jury sent out a note asking how many years had to be served before a person was eligible for parole." *Id.* at ¶ 10, 130 P.3d at 278. The District Court, without consulting counsel, told the jury it had all the law and evidence necessary to render its decision. Counsel objected to this response after the verdict. Finding the District Court should have instructed the jury of the effect of the 85% Rule, this Court vacated the sentence and remanded for re-sentencing. *Id.* at ¶ 34, 130 P.3d at 285.

¶ 53 In *Carter v. State*, 2006 OK CR 42, 147 P.3d 243, this Court held that the ruling in Anderson applied in all cases pending on direct review and not yet final at the time Anderson was decided. *Id.* at ¶ 4, 147 P.3d at 244. Coincidentally, the jury here deliberated Appellant's sentence the day before this Court decided Anderson. Appellant's conviction and sentence are clearly not final and, according to *Carter*, he comes within the holding of Anderson.

¶ 54 In Appellant's case, the jury sent out a note asking: "If we find defendant guilty of either or both charges can we sentence to a specific no. of years such as 25 or 50 or 500? Or are we limited to life as the max? How many year [sic] are they req. to serve if we assign a specific # of yrs? Same question for life imprisonment? Does a sentence of life without parole create an automatic appeal?" Appellant requested an instruction from the District Court telling the jury he would serve 85% of sentences for murder and/or child neglect before being eligible for release on parole. The District Court refused this instruction and informed the jury that the possibility of eventual release on parole was "not relevant to your deliberations." The District Court told the jury that life imprisonment and life without possibility of parole "are to be understood in their plain and literal sense;" and that Appellant would not be eligible for parole if sentenced to life without possibility of parole. We find the District Court's denial of Appellant's requested instruction on the 85% Rule was error under Anderson.

¶ 55 We do not automatically reverse a case for *Anderson* error, but rather determine whether the error resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. *Carter*, at ¶ 5, 147 P.3d at 244. In *Carter*, we found it significant that Appellant was seventeen years old when he committed the murder. "At minimum, the jury's question asking for clarification of 'life' imprisonment is an important indication that a properly instructed jury might have considered a life sentence appropriate due to Appellant's youth at the time of the offense." *Id.* at ¶ 6, 147 P.3d at 244–245. The jury's

note in the instant case sought information about parole eligibility regarding a wide range of possible sentences, making it impossible to ascertain what effect an instruction on the 85% Rule might have had on deliberations. Jurors were left with unanswered questions about the meaning of "life" imprisonment and how it interacts with a potential release on parole if chosen over a sentence of life without possibility of parole.

¶ 56 The driving concern for the Court in *Anderson* was that "jurors are likely to assume that defendants would become parole eligible at a much earlier point in time," resulting in "unnecessary and unfair prejudice to the defendant—due to juries 'rounding up' their sentences, in an attempt to account for their uninformed guesses about the impact of parole." *Anderson*, at ¶ 23, 130 P.3d at 282. In this case, we again find the jury's unanswered request for information about the length of time served on sentences and the meaning of life imprisonment creates grave doubt that the lack of an 85 % instruction prejudicially impacted the sentencing deliberations. We are again persuaded to follow our statement in *Carter*:

> Because the jury sentenced Appellant without pertinent information about his parole ineligibility under the 85% Rule—information it clearly wanted and believed relevant to its decision—the proper remedy here is to vacate the sentence and remand for a re-sentencing proceeding before a properly instructed jury or, if a jury is waived by Appellant, re-sentencing by the District Court.

*Id.* at ¶ 7, 147 P.3d at 245. We therefore vacate the sentences and remand this case for re-sentencing.

¶ 57 In Proposition Eight, Appellant seeks relief based on instances of alleged prosecutorial conduct. Counsel are entitled to liberal freedom of speech in arguing competing inferences of the case from their opposing points of view. *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946. Reversal is required only where grossly improper and unwarranted argument affects a defendant's rights. *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556. Appellant's first complaint is that the prosecutor told the jury it need not answer the question "why" to convict Appellant of first-degree murder. The comment properly emphasized that the State's evidence need not explain Appellant's inexplicable actions in committing these crimes. The prosecutor's arguments offered his interpretation of the evidence and how the jury should apply the instructions of the court. *Hancock v. State*, 2007 OK CR 9, ¶ 101, 155 P.3d 796, 820. There is no reversible error.

¶ 58 Appellant next objects to the prosecutor's argument that the large water spot found on the floor of the bedroom in Appellant's apartment was "unexplained." Appellant takes this as a prohibited comment on his silence in violation of the privilege against self-incrimination, *see Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); but "[t]his Court has held that when a defendant fails to offer any evidence the prosecutor is not prevented from discussing the evidence and to state that such evidence is uncontradicted." *Brown v. State*, 1975 OK CR 243, ¶ 12, 544 P.2d 555, 558. We find this a fair comment on the inferences arising from the presence of a large wet area on the bedroom floor following a scalding incident, in light of Appellant's claims that it occurred in the kitchen. Any number of sources might have provided an innocent explanation for this evidence, but none did. There is no grossly improper conduct or unfair prejudice. Proposition Eight requires no relief.

¶ 59 Appellant's Proposition Nine challenges the performance of defense counsel in two separate allegations of ineffectiveness. These complaints are judged by the familiar test in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective counsel claims must overcome a strong initial presumption that counsel rendered reasonable professional assistance by showing: (1) that trial counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Spears v. State*, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445. To determine whether performance was deficient, we analyze whether the challenged act or omission was objectively reasonable under prevailing professional norms. Appellant has the burden to show counsel

committed errors so serious that he was not functioning as the counsel guaranteed by the Constitution. *Browning v. State,* 2006 OK CR 8, ¶ 14, 134 P.3d 816, 830. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. Pursuant to Rule 3.11(b)(3)(B), *Rules of the Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2007), Appellant has filed a motion to supplement the record and remand for evidentiary hearing in connection with this proposition.[5]

¶ 60 The absence of any *Strickland* prejudice provides a sufficient ground to dispose of the claims before us. Appellant first challenges defense counsel's failure to object to police entry into Appellant's apartment on June 20, 2005, several days after the search warrant obtained on June 9, 2005, had expired. As a result of this entry, police poured boiling water on the floor and made observations about the condition of the kitchen floor. The State offered testimony of these observations at trial. Appellant's argument fails because he voluntarily consented to the search of his apartment. He has not shown that a search warrant was required (see the discussion of Proposition Five, above) or that he subsequently revoked his consent. Counsel's failure to object to admissible evidence is not deficient performance and does not result in prejudice. *Bland v. State,* 2000 OK CR 11, ¶ 118, 4 P.3d 702, 732.

¶ 61 Appellant next alleges ineffective assistance from counsel's failure to raise a proper objection to testimony from Appellant's girlfriend, Lakeishia Thomas. Ms. Thomas testified, among other things, that she and Appellant slept together at Appellant's apartment the evening that Keenan was injured. Appellant woke Ms. Thomas before dawn and they had sex, after which she went back to sleep. Appellant argues that because police learned of this sexual liaison from Appellant's suppressed statement before it was confirmed by Ms. Thomas in a subsequent interview, her testimony was tainted and should have been suppressed.

¶ 62 Appellant again shows no prejudice. We found this testimony relevant as tending to show Appellant's neglect of his son's medical needs However, Appellant's own statements and other evidence established that he injured his son around 8 p.m. on the evening of June 8, 2005, and waited until around 4 p.m. the following day to seek medical help. Even if the admission of Lakeishia Thomas' testimony about having sex with Appellant was error,[6] when viewed in the context of other evidence contributing to the conviction, it was harmless beyond a reasonable doubt. *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)(admission of involuntary statement may be harmless error). This sub-proposition and the supplemental materials fail to show by clear and convincing evidence a strong possibility that trial counsel was ineffective. The application to supplement the record and remand for evidentiary hearing in connection with this claim is therefore denied. Rule 3.11(B)(3)(b)(i). Proposition Nine requires no relief.

¶ 63 Proposition Ten seeks reversal or modification of the sentence based on cumulative error. The District Court's refusal of requested jury instructions did not result in a

---

5. Appellant seeks to supplement the record with evidence that police obtained information from his suppressed statement that he had sex with Lakeisha Thomas the morning after he injured Keenan. He argues this information was fruit of the poisoned tree and should have been suppressed, and that trial counsel was ineffective for failing to raise this objection to Lakeisha Thomas' testimony at trial.

6. We note that police were aware of Lakeishia Thomas and her relation to Appellant from the earliest stages of their investigation. A thorough interview of Ms. Thomas would have revealed her whereabouts during the previous day regardless of Appellant's statements. The inevitable discovery of the fact that Appellant had sex with Ms. Thomas dissipates any taint from the officers' use of Appellant's involuntary statement to develop this evidence. *Pfeifer v. State,* 1969 OK CR 167, ¶¶ 10–13, 460 P.2d 125, 127–128 (testimony and evidence that would have been obtained in thorough investigation is purged of primary taint arising from initial identification of witnesses through illegal search).

miscarriage of justice requiring reversal. We remand for re-sentencing to remedy the District Court's refusal of an instruction on the 85% Rule. No other relief is required.

## DECISION

¶ 64 The Judgments of Conviction of the District Court of Tulsa County are **AF-FIRMED**. The Sentences are **REVERSED** and **REMANDED FOR RE–SENTENC-ING**. Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2007), the **MANDATE is ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J., C. JOHNSON, V.P.J., and A. JOHNSON, J.: concur.

CHAPEL, J.: dissents.

CHAPEL, J., dissenting:

¶ 1 I dissent to the resolution of this case. I fully agree that the trial court should have instructed the jury on excusable homicide and second-degree manslaughter. The majority finds these errors harmless. I would reverse and remand the case to allow a properly instructed jury to determine Ball's guilt or innocence.

¶ 2 I also disagree with the majority's resolution of Proposition One. The medical examiner, Dr. Distafano, testified that Ball intentionally poured scalding water on the victim. The majority concludes that this was appropriate expert opinion testimony. An expert may offer an opinion on an ultimate issue if it would assist the trier of fact.[1] An expert may give an opinion on the cause of a child's fatal injuries, based on the expert's clinical observations and the victim's history as relevant to the medical examination, or based on a combination of expertise and statistical probabilities.[2] However, the expert testimony must focus on the cause of the child's injuries rather than the defendant's guilt.[3] An expert may not give an opinion on an ultimate issue which is not supported by the facts or data on which experts in his field reasonably rely.[4] An expert opinion cannot remove the inferential steps necessary to a jury's deliberations and undermine the jury's fact-finding duties by effectively telling jurors what result to reach.[5] Had Dr. Distefano simply testified that the evidence was not consistent with an accidental pour, I might agree that his testimony was proper. He did not.

¶ 3 Dr. Distefano's testimony is ultimately improper, as he reached a conclusion not based on the evidence, and told jurors what result to reach. Initially, he testified that the death was due to scalding, and said that his conclusion the death was a homicide was the result of the delay between the original injury and the time it was reported. I believe both these conclusions fall within the scope of expert opinion. They focus on and are based on the nature and extent of the victim's injuries and surrounding facts, and suggest inferences jurors may draw without telling jurors what result to reach. However, he also testified that, in scalding the victim, Ball implicitly or explicitly intended to harm him. First, this suggests the witness was able to read Ball's mind. The physical evidence and history Dr. Distefano used in reaching his conclusions all clearly showed that the injuries were caused by scalding; however, nothing in his testimony suggested that he could determine Ball's mental state

---

1. *Johnson v. State,* 2004 OK CR 25, 95 P.3d 1099, 1104.

2. *Revilla v. State,* 1994 OK CR 24, 877 P.2d 1143, 1150–51.

3. *Id.See also Schultz v. State,* 1988 OK CR 17, 749 P.2d 559, 562 (expert opinion that injury was not result of accident was based on nature and extent of injuries).

4. *McCarty v. State,* 1988 OK CR 271, 765 P.2d 1215, 1218 (expert testified that defendant was at scene of crime based on hair evidence, though science of hair comparison could not support that conclusion); *see also Romano v. State,* 1995 OK CR 74, 909 P.2d 92, 109–110 (expert testified that defendant participated in murder based on blood spatter pattern).

5. *Romano,* 909 P.2d at 109.

from this evidence. This conclusion simply cannot be reached within the bounds of the science supporting Dr. Distefano's expert testimony.

¶4 This improper testimony apparently stems from a misunderstanding of the law on the part of Dr. Distefano. This statement was in response to a question asking why he classified the victim's death as a homicide rather than an accident. The explanation above, which involved the nature of the injuries and delay in reporting, was sufficient to answer this question. However, Dr. Distefano also explained that he defined the category "homicide" as a death resulting from the act of another person "and that act had intent to harm, either implicitly or explicitly." While this may be Dr. Distefano's personal definition of homicide, it is not the legal definition. Homicide is no more nor less than the killing of one human being by another.[6] There is no intent requirement; indeed, if every homicide were an intentional killing there would be no need for separate murder and manslaughter statutes. By adding this explanation, Dr. Distefano told jurors that Ball intentionally caused the victim's death by scalding—that is, he told the jurors what result to reach. In doing so he also misstated the law. This misstatement was never corrected; jurors were only instructed on the elements of first degree child abuse murder.

¶5 Dr. Block reviewed the medical records and history and testified regarding the cause of the victim's injuries. He, too, gave his opinion that the victim died of scalding. Based on the nature of the injuries, he concluded that they were created by a pour rather than an instantaneous splash or spill. This conclusion is appropriate expert opinion testimony. Dr. Block testified that, based on the location and pattern of the burns and the absence of incidental splash marks, the injuries were not consistent with an accidental spill. This also was appropriate. He stated that the delay in treatment constituted very bad judgment and led to the victim's death; again, this is not improper. Nowhere in his testimony did Dr. Block state that Ball intentionally harmed the victim. The jury was free to draw that inference from his medical conclusions based on the evidence, but that is the jury's job.

¶6 Dr. Block gave appropriate expert opinion testimony. Had Dr. Distefano simi-

larly confined his opinion, I would have no objections to it. However, he went too far. The medical examiner told jurors that Ball intentionally scalded the victim, killing him. This is exactly the question jurors were to decide. I cannot conclude that this improper testimony, coming from the State's chief expert witness, had no effect on the jury's determination of guilt.